# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ROME DIVISION

FIDELITY & GUARANTY LIFE
INSURANCE COMPANY, f/k/a
OM FINANCIAL INSURANCE
COMPANY,

     Plaintiff,

v.

PATRICIA DUPREE BROOKS a/k/a
PAT BROOKS-DUPREE, et al.,

     Defendants.

CIVIL ACTION FILE
NO. 4:12-CV-0230-HLM

## ORDER

This is an interpleader action brought by an insurance company concerning the insurance company's obligation to pay benefits under an accidental death benefit rider to an insurance policy issued to the decedent, Richard Keith ("Mr. Keith"). The case is before the Court on the Motion to

AO 72A
(Rev.8/8
2)

Exclude Robert Bennett, Ph.D., as an Expert Witness Under Fed. R. Evid. 702 and/or to Strike His Opinion Under Fed. R. Civ. P. 37 ("Motion to Exclude") [115] filed by Plaintiff Fidelity & Guaranty Life Insurance Company ("Plaintiff").

## I.     Procedural Background

On October 2, 2012, Plaintiff filed this lawsuit.  (Docket Entry No. 1.)  Count one of Plaintiff's Complaint contained an interpleader claim that sought to resolve various competing claims to the $250,000 death benefit payable under an insurance policy (the "Policy").  (Compl. (Docket Entry No. 1) ¶¶ 20-23.)  Count two of Plaintiff's Complaint sought a declaratory judgment holding that Plaintiff did not owe a benefit under the Policy's accidental death benefit rider.  (Id. ¶¶ 24-34.)

2

On July 2, 2013, the Court approved a Consent Final Order presented by the Parties and dismissed former defendants Carla Richelle Keith Barton, Richard C. Keith, Jr., and Owen Funeral Home from this action.  (Order of July 2, 2013 (Docket Entry No. 77).)  The Court entered a final judgment as to the interpleader count of the Complaint. (Id.; Docket Entry No. 78.)   Consequently, only the declaratory judgment count of the Complaint remains pending,  and  Defendant  Patricia  Dupree  Brooks ("Defendant Brooks") is the only remaining Defendant.

On February 7, 2014, Plaintiff filed its Motion to Exclude.  (Docket Entry No. 115.)  The briefing process for the Motion to Exclude is complete, and the Court finds the matter ripe for resolution.

3

## II.   Dr. Bennett's Opinions

### A.   Expert Report

Dr. Bennett's expert report states that Dr. Bennett has "examined all of the material [that Defendant Brooks's counsel] provided in order to determine if any evidence exists indicating any manner of death other than suicide." (Expert Report of Robert Bennett, Ph.D. ("Expert Report") (Docket Entry No. 115-1) at 2.)  Dr. Bennett stated:

> The methodology I used is to examine the provided files (documents and photographs) for clues and facts that are <u>inconsistent</u> with suicide. In order to be comprehensive, I also examined the files for clues and facts that are <u>inconsistent</u> with the cause of death, which the Coroner has assessed as carbon monoxide poisoning.

(<u>Id.</u> (emphasis in original).)

4

AO 72A

(Rev.8/8
2)

Dr. Bennett's expert report stated: "The G.B.I. Toxicology Report indicates the presence of the prescription drugs zolpidem (Ambien®) and tramadol (Ultracet®). The blood concentration was 3.0 mg/L of zolpidem and 2.8 mg/L of tramadol. These levels are consistent with overdosage." (Expert Report at 3.)

Dr. Bennett's expert report provided, in relevant part:

Inconsistencies with suicide:

1.)  Most prominently is that suicide by carbon monoxide poisoning requires a closed environment for the automobile exhaust to concentrate to a toxic level.  The car is parked next to two OPEN windows.  The car's top is down, allowing for more complete air circulation in from the open windows.  There is no hose or pipe running from the exhaust pipe to the decedent. The car next to two open windows is highly inconsistent with suicide by carbon monoxide.  In fact, the open windows and car location is counterproductive to suicide.  Having the windows

5

open would only prolong the death process.  The open windows are consistent with July weather. The windows would not have needed to be opened after the fact, because the double garage door was open and had been for some time. There is no documentation that anyone opened the garage windows, only the residence windows.

2.)  Mr. Keith's eyeglasses were on the trunk of the car, in a manner consistent with being placed there (as opposed to being thrown or dropped) and in a location on the trunk if the wearer were engaged in some activity on the driver's side near the retracted convertible top (i.e. securing the convertible top by hand into the fully retracted position), and consistent with the side a driver would engage (i.e. the driver's side).  Information provided by the office of Attorney Morgan Akin is that Mr. Keith [h]ad the top up the night before when the car was parked in the garage, so he would have had to lower it, as it is seen in the photographs.

3.)  Mr. Keith was dressed in color coordinated (red) clothes, with shirt tucked in, socks donned uniformly, and sandals strapped for mobility (driving, walking).  It is reported that he routinely went out in the mornings for breakfast at

6

McDonalds and wore those red clothes most every time, had been doing so for years, and the employees knew Mr. Keith well and by name. He was wearing his wristwatch, and reportedly had his cell phone with him. He had his eyeglasses with him. His hat was placed neatly on the passenger seat. Having a hat is an activity common with a bald white male driving in a convertible, in order to protect the top of the head from sunburn. The clothing was consistent with the July weather. The clothing and other items delineated are consistent with travel and inconsistent with suicide at the scene.

4.) The nasal drainage found on the right side of his face and pooled on the right side of the shirt covering the chest was also found on the seatbelt according to information provided by the office of Attorney Morgan Akin. The position of the nasal drainage on the seatbelt was consistent with Mr. Keith having buckled himself in, which is indicative of preparing to drive. It is inconsistent with suicide for an individual to buckle himself in the driver's seat. This is directly consistent with someone who is preparing for an immediate drive.

7

AO 72A

(Rev.8/8

2)

5.)   No suicide note was left.   This is also inconsistent with an alleged previous suicide attempt, in which a note was written.

6.)  Death was by carbon monoxide poisoning, a suicide method not common with males.

(Expert Report at 4-5.)  According to Dr. Bennett:

Suicide is a definitive decision that is usually premeditated by the individual.  The decision to commit suicide is followed by a plan.  The plan is to perform the suicide in a manner for it to be successful, as determined by the method chosen. If the method chosen were by carbon monoxide poisoning, then the individual would take steps to ensure a closed environment, as opposed to sitting in a car next to two open windows. Secondly, suicide by carbon monoxide poisoning in an enclosed garage does not involve preparing one's self and one's car for travel, as was in this case.   There are multiple inconsistencies in this case for suicide by carbon monoxide poisoning.

Autopsy reports stomach contents of only about 50 ml of substance.  The stomach can hold about 2000-4000 ml of substance.  Therefore Mr. Keith had an empty stomach.  This is consistent with his

8

need to partake in his daily routine of traveling by car to get breakfast.  This is also consistent with causing a high blood level of either of his prescription drugs, if taken on an empty stomach[.]

Tramadol is subject to significant post-mortem drug redistribution in the body.  According to a Report issued by the Federal Aviation Administration, Civil Aerospace Medical Institute . . ., the level of Tramadol of a blood specimen taken after death can result in higher levels tha[n] actually existed at the time of death.  The most accurate level is that taken at the time of death; as time passes, the accuracy of the level diminishes significantly.

Zolpidem is subject to significant post-mortem drug redistribution. . . .  This can result in higher levels of the drug than actually existed at the time of death.

According to a study published in the journal Legal Medicine . . ., the onset of rigor mortis plays a role in the physical post-mortem redistribution of drugs, due to blood movements influenced by pressure and fluidity changes as tissue and organs begin to stiffen.  Rigor mortis begins to take effect 2-4 hours after death. . . .  This causes significant

9

AO 72A

(Rev.8/8
2)

changes in the blood concentration of drugs, which may be observed within a few hours after death. To further support these claims, a study conducted on animals showed that post mortem drug redistribution began to occur as early as four hours after death. . . . Since the blood specimen was taken a full day after death, significant post-mortem drug redistribution occurred. The concentration of both zolpidem and tramadol reported on the G.B.I. Toxicology Report could have little relevance to the level that was present at the time of death. There is no evidence that the levels of the drugs detected post-mortem are an accurate reflection of the amount that was actually in Mr. Keith's bloodstream at the time of death.

Mr. Keith was under the influence, to some degree, of both zolpidem and tramadol, as these drugs were detected in his system. These drugs individually can cause drowsiness and depression of Central Nervous System (brain) functioning and inability to think clearly. When in the body at the same time, as in the case of Mr. Keith, the effects are multiplied, potentially resulting in an inability to think clearly, which could lead to mistakes that could result in accidental death, even at therapeutic (normal) concentrations. The drug manufacturers warn of this adverse reaction and

10

Pharmacists apply labels to the prescription bottles warning the patient.

According to information provided by the office of Attorney Morgan Akin, after Mr. Keith's alleged suicide attempt in April 2012, his fiancée, [Defendant] Brooks became overprotective and insisted on regulating the amount of zolpidem in Mr. Keith's possession. [Defendant] Brooks gave Mr. Keith only 7-14 pills at a time. On Friday, July 20, 2012, 3 days before his death, [Defendant] Brooks gave Mr. Keith 7 zolpidem pills. She believes Mr. Keith had 0-3 pills still in his possession, bringing the maximum possible number of pills Mr. Keith had access to between July 20, 2012 and his death on July 23, 2012 to 10 pills, which would theoretically allow only a maximum overdose of 10 times the prescribed dose. . . . [E]ven if Mr. Keith consumed up to 10 pills he may have had access to, this dosage is not high enough to be lethal. However this dose is high enough to induce drowsiness and confusion.

According to the Ingles Pharmacy records, starting December 2011 Mr. Keith was prescribed zolpidem on December 29, 2011, which was not filled until March 16, 2012, indicating he was not

11

seeking the drug, and then refilled once on May 15, 2012.  No other zolpidem was obtained by Mr. Keith.  Tramadol was filled on December 30, 2011 and refilled once March 16, 2012.  This indicates Mr. Keith was not drug seeking.  The pharmacy records indicate that he had not been taking either of the drugs for an extended period of time. Therefore, not enough time had passed to build up tolerance to the drugs, thus making him sensitive to the drowsiness/confusion effects of the drugs. Additionally, it has been shown through pharmacogenic testing that many people are slow metabolizers and therefore build up higher than normal concentrations of the drugs.

Breathing carbon monoxide from automobile exhaust causes the formation of carboxyhemoglobin in the blood.  This causes cellular asphyxiation (cell death).  The G.B.I. Carboxyhemoglobin Report indicates the carboxyhemoglobin saturation of Mr. Keith's blood was 45-49%.  It is generally accepted that levels above 50% are fatal . . . . Death can occur at levels of 35% . . . .Therefore, it appears conclusive that the cause of Mr. Keith's death was carbon monoxide poisoning.

(Id. at 5-7.)

12

Finally, Dr. Bennett's Expert Report provided:

It is my opinion, to a reasonable degree of toxicological and scientific certainty, that the cause of death of Mr. Richard C. Keith is carbon monoxide poisoning and the manner of death is accident (not suicide). There is no evidence that a suicide occurred. There are multiple inconsistencies with suicide and one incidence that is counterproductive to suicide by carbon monoxide poisoning. The medications prescribed to Mr. Keith have, at normal doses, side effects of drowsiness and confusion, which could contribute to an accidental event.

A possible scenario that may have occurred is that Mr. Keith prepared for his normal routine of getting dressed and driving to McDonald's for breakfast. He started the vehicle to put down the electric convertible top because the vehicle needed to be running in order to provide power to the electric top. He then got out of the vehicle to secure the convertible top, laid his glasses on the trunk to do so, got back in the vehicle to proceed, but first searched for his glasses in order to drive, was unable to find his glasses on his person or in the console, seat, floorboard, dash, etc (because he forgot he left them on the trunk) and during this

13

AO 72A

(Rev.8/8
2)

search became unconscious due to the building carbon monoxide.

(Expert Report at 7.)

## B.   Dr. Bennett's Deposition

### 1.   Education, Qualifications, and Experience

Dr. Bennett has a pharmacy degree and a Ph.D. in pharmaceutical science. (Dep. of Robert M. Bennett, Ph.D. (Docket Entry No. 116) at 27-28.) According to Dr. Bennett, pharmaceutical science includes drug science and toxicology. (Id.) Dr. Bennett performs forensic work, and oversees drug and alcohol testing programs in workplaces. (Id. at 28, 30.)   Dr. Bennett primarily oversees the processes and procedures for drug testing in those workplaces, while the actual drug testing is done at outside

14

laboratories.  (Id. at 30.)  Dr. Bennett, however, still does some analyses, including drug and alcohol tests, microscopic work, semen analysis, hair, fiber, and ballistics. (Id.)

Dr. Bennett took four psychology classes in college, but did not graduate as a psychology major.  (Bennett Dep. at 32-33.)  Dr. Bennett did not engage in further formal study of psychology, and never worked as a psychologist.  (Id. at 34, 42.)  Dr. Bennett, however, contends that he has an informal education in psychology via reading and literature review and dealing with clients. (Id. at 42-43.) According to Dr. Bennett, attorneys hire him to evaluate individuals and the effects of drugs on those individuals' abilities to perform certain functions, which gives him a psychology education

15

every day.  (Id. at 43.)  Dr. Bennett testified that he must use psychological strategies to determine situations and to communicate with clients.  (Id.)

Most of Dr. Bennett's training classes have been in the fields of pharmacology and review of medications.  (Bennett Dep. at 45.)  Dr. Bennett also took classes on technical writing and computer systems searching.  (Id.)  According to Dr. Bennett, all of those classes are directly applicable to forensic work.  (Id.)

Dr. Bennett defines the term "forensics" as using science and applying it to legal cases.  (Bennett Dep. at 46.) Forensics includes a number of types of specialties.  (Id. at 47.)  Dr. Bennett has not published in the field of forensics. (Id. at 48.)  Dr. Bennett, however, contends that most of his

16

presentations consist of forensics presentations to the legal community.  (Id. at 49-50.)  Dr. Bennett defines "forensic science" as any science that he uses, performs, trains, or lectures on as applied to the legal system.  (Id. at 51.)

Dr. Bennett testified that pharmacology is the study of the effect of drugs on the body.   (Bennett Dep. at 52.) According to Dr. Bennett, pharmacology is the study of the positive effect of a drug's chemical effect on the body, while toxicology focuses on the drug's negative or unwanted effects.  (Id. at 53.)  Most of Dr. Bennett's publications are reviews of drugs and their effects.  (Id. at 55.)

Dr. Bennett is not an expert in ballistics.  (Bennett Dep. at 55.)  Dr. Bennett has not made presentations concerning suicide versus accidental death.  (Id. at 55-56.)  Dr. Bennett

17

also has not made presentations concerning investigating the manner of death.  (Id. at 56.)

Dr. Bennett never performed an autopsy, is not a detective, and has no law enforcement experience. (Bennett Dep. at 182, 185.)  Dr. Bennett is not certified by a forensic board, including in the areas of forensic toxicology or forensic autopsies, is not a medical examiner, and is not a medical doctor.  (Id. at 186.)   Dr. Bennett contends that he has practiced forensic science for years, although not directly in the context of determining whether a death is a suicide or an accident.  (Id. at 192.)  According to Dr. Bennett, his opinions require more expertise and skill than a typical layperson would possess.  (Id. at 193-94.)  Dr. Bennett contends that he has performed analyses in

18

hundreds of cases that involve various forensic aspects, many of which involve death, although he was not called upon to determine the manner of death in those cases. (Id. at 194.)  Dr. Bennett contends that his career focuses on developing skills on an ongoing basis that would provide him with expertise to develop this case.  (Id. at 195.)

Dr. Bennett has performed work as a legal expert for six years.  (Bennett Dep. at 57.)  Dr. Bennett's work has focused mainly on the pharmaceutical or toxicology effects of chemicals or drugs, as opposed to focusing specifically on the manner of death.  (Id. at 61.)  According to Dr. Bennett, his expertise in toxicology more often than not contributes to the determination of the manner of death. (Id.)

19

According to Dr. Bennett, the cause of death is the actual agent that causes damage to the body, while the manner of death is the reason for the death. (Bennett Dep. at 62.) Dr. Bennett contends that he indirectly provided information concerning the manner of death and that his expertise on the cause of death can be used to clarify or determine the manner of death. (Id. at 63.) Dr. Bennett, however, was never previously asked to opine directly as to the cause of death. (Id. at 63, 187-189.) Here, Dr. Bennett was retained to determine if the cause of death was suicide or accidental death. (Id. at 69-70). According to Dr. Bennett, he was to determine the cause of death and the manner of death, and to give opinions as to both. (Id. at 70.)

20

### 2.  Opinions and Methodology

Dr. Bennett testified that his final report contains all of the opinions that he plans to offer in this case and identifies all information that he considered in forming his opinions. (Bennett Dep. at 98.)  According to Dr. Bennett, he was asked to determine if evidence existed that indicated that the manner of death was other than suicide.  (Id.)  Dr. Bennett calls this methodology forensic science.  (Id.)

According to Dr. Bennett, he has two opinions: (1) an opinion as to the cause of death; and (2) an opinion as to the manner of death.  (Bennett Dep. at 99.)  Dr. Bennett does not dispute that the cause of death was carbon monoxide poisoning. (Id. at 100.) To determine the manner of death, Dr. Bennett looked to examine clues or facts that

21

he deemed were inconsistent with suicide. (Id. at 101.) Dr. Bennett disagrees with the determination that the manner of death was suicide. (Id.)

Dr. Bennett's primary focus was to discover inconsistencies with suicide. (Bennett Dep. at 103.) According to Dr. Bennett, those inconsistencies include the fact that two garage windows were open, the fact that Mr. Keith's eyeglasses were on the trunk of his car, the fact that Mr. Keith was dressed as if going out, and the absence of a note. (Id. at 104-05.) Consistent with suicide, however, were Mr. Keith's financial difficulties, his life insurance policy, and his previous suicide attempt. (Id. at 106.) Dr. Bennett's methodology consisted of the accumulation of his

22

career experiences, as well as his education, self-education, and case work.  (Id. at 111, 191-92, 206, 212-213.)

Dr. Bennett acknowledged that tramadol should not be mixed with zolpidem.   (Bennett Dep. at 135-36.)   Dr. Bennett, however, opined that the cause of death was carbon monoxide poisoning and that the manner was an accident, not suicide. (Id. at 138.) Dr. Bennett noted that the toxicology supports that opinion, noting that the level of carboxyhemoglobin in Mr. Keith's blood was consistent with levels that could cause death.   (Id.)   According to Dr. Bennett, Mr. Keith had to breathe in enough carbon monoxide to reach those levels, and if the cause of death was drugs, both tramadol and zolpidem cause respiratory depression.  (Id. at 138-39.)  Dr. Bennett opined that if the

23

cause of death were drugs, Mr. Keith would have reached a point where he would not have breathed in carbon monoxide, which, in turn, would cause the carboxyhemoglobin levels not to be as high. (Id. at 138-39.)

Although the levels of drugs in Mr. Keith's system were high, Dr. Bennett opined that those levels were not sufficient to cause him to change his opinion as to the cause of death. (Bennett Dep. at 139-40.)  Dr. Bennett pointed out that everyone agrees that the cause of death was carbon monoxide poisoning, and that the drugs were not a lethal overdose sufficient to cause death.  (Id. at 140.)

The toxicology report indicated that Mr. Keith had zolpidem and tramadol in his system.  (Bennett Dep. at 141.) Those drugs cause drowsiness and depression of the

24

central nervous system, including brain function and the ability to think clearly. (Id. at 141-42.) Mr. Keith was under the influence of both medicines, and the presence of the medicines, particularly together, contributed, at least in part, to his death. (Id. at 142.)

Dr. Bennett testified that Mr. Keith could have taken the drugs at any time within the twenty-four hours prior to his death. (Bennett Dep. at 143.) Mr. Keith was found at 9:45 a.m., and Dr. Bennett believes he was found within a few hours after his death. (Id. at 143-44.)

According to Dr. Bennett, an analysis of Mr. Keith's stomach contents would be helpful, because it would help Dr. Bennett determine the concentration of drugs in Mr. Keith's system. (Bennett Dep. at 145-46.) If the

25

concentration were relatively high or indicated that Mr. Keith took the drugs shortly prior to his death, those factors could indicate that the manner of death was suicide.  (Id. at 147.)

Dr. Bennett testified that Mr. Keith's prescription for zolpidem instructed him to take one pill at bedtime. (Bennett Dep. at 147.)  If Mr. Keith took two zolpidem pills at bedtime, he would not be taking the medicine as prescribed.  (Id. at 147-48.)   Likewise, if he took one zolpidem pill in the morning, he would not have taken it as prescribed.  (Id. at 148, 154.)

Dr. Bennett testified that Mr. Keith's prescription for tramadol directed him to take two pills every four to six hours as needed for pain.   (Bennett Dep. at 149.) According to Dr. Bennett, if Mr. Keith took four tramadol at

26

one time, he would not be taking those pills as prescribed. (Id.) Likewise, if he took two tramadol at one time and then took two more tramadol two hours later, he would not be taking the pills as prescribed. (Id.)

Likewise, if Mr. Keith took zolpidem and tramadol together at one time, he would not be taking the drugs as prescribed. (Bennett Dep. at 150.) The medical literature cautions against taking those medications together, and Mr. Keith's doctor should have warned Mr. Keith not to take the medications together. (Id. at 150-51.) If Mr. Keith's stomach contents revealed that he took the zolpidem and tramadol together, it would lend credence to the theory that he committed suicide. (Id. at 152.) Likewise, if the pills

27

were visible in Mr. Keith's stomach contents, that would be consistent with suicide.  (Id. at 181-82.)

According to Dr. Bennett, Mr. Keith had an empty stomach.  (Bennett Dep. at 152.)  Taking either zolpidem or tramadol on an empty stomach is consistent with causing a high blood level of either drug.  (Id. at 153-54.)

Dr. Bennett further opined that post-mortem distribution may have skewed Mr. Keith's drug levels.  (Bennett Dep. at 155-172.)  According to Dr. Bennett, once death occurs, drugs can diffuse through various regions at different rates, causing blood samples taken at different sites to reveal different levels of drug concentrations.  (Id. at 158-160.) Dr. Bennett contends that tramadol goes into the muscle, that rigor mortis squeezes tramadol out of muscles, and that

28

blood samples taken after rigor mortis sets in may result in drug levels that are not indicative of the ante-mortem drug level. (Id. at 159-60.)

Dr. Bennett further testified that a difference exists between central blood, which is cardiac blood in the central part of the cardiovascular system, and peripheral blood, which is blood from the blood vessels in the periphery of the body. (Bennett Dep. at 160.)

According to Dr. Bennett, different drugs have higher or lower incidences of post-mortem redistribution. (Bennett Dep. at 163.) Dr. Bennett opined that tramadol was listed in an article that contained a list of drugs with the highest post-mortem redistribution, and that tramadol was listed in another article as a drug in which post-mortem redistribution

29

may occur.  (Id. at 165.)  Dr. Bennett did not know whether the blood tests in those studies used central or peripheral blood.  (Id. at 168.)

According to Dr. Bennett, femoral blood undergoes the least amount of post-mortem redistribution and is the preferred blood for post-mortem testing.  (Bennett Dep. at 166.)

Dr. Bennett further noted that an article lists tramadol as a drug that concentrates in the bile, which comes from the gallbladder. (Bennett Dep. at 168-69.) The gallbladder, in turn, is underneath the liver and near the iliac vein.  (Id.) According to Dr. Bennett, drugs could diffuse from the gallbladder directly into the iliac vein, causing relatively high

30

AO 72A

(Rev.8/8
2)

concentrations of drugs that are not indicative of antemortem blood levels.  (Id.)

Dr. Bennett opined that no conclusions concerning Mr. Keith's taking of the medications could be drawn from the toxicology report based on the blood tests.  (Bennett Dep. at  170.)  Dr. Bennett contends that the report should have analyzed both central and peripheral blood, and notes that the report did not analyze the central blood.  (Id. at 171-72.) According to Dr. Bennett, the only conclusion that can be drawn from the toxicology report is that at some time, Mr. Keith took zolpidem and tramadol.  (Id. at 173, 177-78.) Dr. Bennett opined that Mr. Keith took zolpidem and tramadol within twenty-four hours before his death.  (Id. at 178.)

31

Dr. Bennett opined that zolpidem is absorbed very rapidly, reaches maximum blood levels approximately one and one-half to two hours after it is taken, and tapers dramatically afterward.   (Bennett Dep. at 174, 176.) Zolpidem has a more dramatic absorption rate if it is taken on an empty stomach.  (Id. at 174.)

Tramadol also hits peak blood levels within one and one-half to two hours, and drops dramatically afterward. (Bennett Dep. at 176.)  By the next day, tramadol is no longer measurable in the system.  (Id. at 177.)

In this case, Dr. Bennett's methodology consisted of looking at the facts and circumstances provided and assessing whether those facts and circumstances were consistent with, or inconsistent with, suicide. (Bennett Dep.

32

AO 72A
(Rev.8/8

at 215-16.)   According to Dr. Bennett, he developed his methodology from years of working on cases, developing his skills, and reading articles on forensic processes.  (Id. at 217.)

## II.   Motion to Exclude

### A.   Parties' Positions

Plaintiff argues that Dr. Bennett is not qualified to offer an opinion concerning whether Mr. Keith committed suicide. (Pl.'s Br. Supp. Mot. Exclude (Docket Entry No. 115-2) at 3, 7-9.)  Alternatively, Plaintiff contends that this opinion is not reliable because it does not require specialized knowledge and is not based on scientific or generally accepted methodology.  (Id. at 11-12.)   Plaintiff also contends that Dr. Bennett's opinion that Mr. Keith's "toxicology results do

33

AO 72A
(Rev.8/8
2)

not establish that he took an overdose of zolpidem and tramadol, or that any overdose contributed to his death," relies on "unsupportable assumptions versus objective evidence," and that "Dr. Bennett did not employ any recognized methodology in reaching his opinions." (Id. at 3.) Further, Plaintiff contends that "because Dr. Bennett has offered no opinion (nor can he) on the actual question at issue, whether [Mr. Keith] could have taken these medications as prescribed, his testimony here would only confuse the trier of fact rather than aid it." (Id.) Specifically, Plaintiff argues that Dr. Bennett's opinion concerning relevancy of the toxicology report, based on his contentions concerning post-mortem redistribution, is unreliable and speculative. (Id. at 12-14.) Additionally, Plaintiff contends

34

that Dr. Bennett's opinion concerning whether Mr. Keith's "failure to take the medication as prescribed directly or indirectly contributed to his death" is unreliable and speculative, is not supported by the evidence or literature, and is based on conjecture. (Id. at 14-15.) Finally, Plaintiff further argues that the Court should exclude Dr. Bennett's opinions under Federal Rule of Evidence 403. (Id. at 17-18.) Alternatively, Plaintiff contends that the Court should strike Dr. Bennett's opinion "to the extent that Defendant failed to comply with [Federal Rule of Civil Procedure] 26(a)(2)." (Id. at 3.)

In response, Defendant argues that Dr. Bennett is qualified to offer his opinions. (Def.'s Resp. Mot. Exclude (Docket Entry No. 125) at 2.) Defendant contends that

35

"disputes as to an expert[']s credentials are properly explored through cross examination at trial, and go to the weight and credibility of the testimony, not its admissibility." (Id. at 7.) Defendant also argues that Dr. Bennett's testimony concerning manner of death is reliable. (Id. at 8.) Further, Defendant contends that Dr. Bennett's opinion concerning suicide is relevant to allow the jury to determine "whether Mr. Keith's death was accident or suicide." (Id. at 12.) Defendant further argues that Plaintiff's Rule 403 argument is premature. (Id. at 12-13.) With respect to Plaintiff's request to strike certain opinions, Defendant notes that Plaintiff fully explored Dr. Bennett's opinions during his deposition and that Plaintiff suffered no prejudice from any alleged failure to disclose those opinions. (Id. at 13-14.)

36

## B.   Discussion

### 1.   <u>Daubert</u> Standard

For approximately seventy years, federal courts faced with challenges to the admissibility of expert witness testimony spent a good deal of effort to determine whether the basis for the testimony was "sufficiently established to have gained general acceptance in the particular field in which it belongs." <u>Frye v. United States</u>, 293 F. 1013, 1014 (D.C. Cir. 1923); <u>United States v. Piccinonna</u>, 885 F.2d 1529, 1531-32 (11th Cir. 1989).   In 1993, the Supreme Court belatedly recognized that the Federal Rules of Evidence had supplanted this standard of admissibility. <u>Daubert v. Merrill Dow Pharm., Inc.</u>, 509 U.S. 579, 587

37

AO 72A

(Rev.8/8

(1993).  Accordingly, the Federal Rules of Evidence serve as the guide for the task at hand.

Federal Rule of Evidence 702 speaks most directly to the admissibility of expert testimony.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

38

Fed. R. Evid. 702.  When conducting the analysis required under Rule 702, the Court conducts a "rigorous three-part inquiry."  <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004).  Under that analysis, the Court may admit expert testimony if: (1) the witness is "qualified as an expert," such that the witness can testify competently with regard to a matter at issue; (2) the testimony is reliable enough to be considered knowledge in the context of the relevant discipline; and (3) the testimony is relevant, in that it assists the trier of fact to understand or come to a conclusion regarding a material issue.  <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998). "While there is inevitably some overlap among the basic requirements--qualification, reliability, and helpfulness--they

remain distinct concepts and the courts must take care not to conflate them." <u>Frazier</u>, 387 F.3d at 1260. "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." <u>Id.</u>

To qualify to testify as an expert, a witness must be able to testify competently regarding the matters she intends to address by virtue of her education, training, experience, knowledge, or skill. <u>Frazier</u>, 387 F.3d at 1260-61 (observing that experts may be qualified in various ways, including scientific training, education, or experience in field). Although an expert's "'overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability.'" <u>Id.</u> at 1661 (quoting <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>,

40

326 F.3d 1333, 1341-42 (11th Cir. 2003)).   Indeed, "'one may be considered an expert but still offer unreliable testimony.'" Id. (quoting Quiet Tech. DC-8, Inc., 326 F.3d at 1341-42).

Thus, before admitting the testimony of a witness qualified as an expert, the Court must engage in a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93.   The objective of this assessment "is to ensure the reliability and relevancy of expert testimony." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); accord Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311-12 (11th Cir.

41

1999) ("The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in the factual determinations, its potential to create confusion, and its lack of probative value."). The focus of the Court's preliminary assessment--the reliability and relevance of expert testimony--requires careful attention.

## a. Reliability

Federal Rule of Evidence 702, in conjunction with Rule 403 and Rule 703, imposes a standard of evidentiary reliability that contrasts with the generous approach to admissibility reflected in Rules 401 and 402. Allison, 184 F.3d at 1310; see also Kumho Tire Co., 526 U.S. at 149; Daubert, 509 U.S. at 589-91; cf. Weisgram v. Marley Co., 528 U.S. 440, 441-42 (2000) (noting that standards of

42

reliability applied to expert testimony are "exacting"). Specifically, when expert "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" <u>Kumho Tire Co.</u>, 526 U.S. at 149 (quoting <u>Daubert</u>, 509 U.S. at 592). In other words, the Court's inquiry focuses not on whether the expert is correct, but whether the proponent of expert testimony has established by a preponderance of the evidence that the testimony is reliable in the context of the methodologies or techniques applied within the appropriate field. <u>Allison</u>, 184 F.3d at 1312.

43

Several considerations may have a bearing on this issue. Whether a theory or technique has been tested, for example, or subjected to peer review and publication, may help to gauge the reliability of the methodology at issue. Daubert, 509 U.S. at 593. Similarly, the degree of acceptance within the relevant community, the existence of standards designed to ensure the credibility or accuracy of a particular technique, the likelihood that a particular technique may result in error, and whether the methodology stands up to the standards applied within the relevant field all may help determine whether the methodology is sufficiently reliable to be considered admissible. City of Tuscaloosa, 158 F.3d at 566 n.25. Rule 702 also expressly requires that the expert's testimony be based upon

44

AO 72A

(Rev.8/8

2)

sufficient facts or data, and that the expert have applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702.

In sum, the Court's objective is to make sure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., 526 U.S. at 152. In keeping with the varied nature of expert testimony, the Court enjoys "considerable leeway in deciding in a particular case how to go about determining whether particular testimony is reliable." Id. The Court's evaluation of the reliability of expert testimony thus does not depend upon a rigid checklist of factors designed to test the foundation of that testimony. Rather, the gatekeeping inquiry must be

45

tailored to the facts of the case and the type of expert testimony at issue.  See id. at 150; City of Tuscaloosa, 158 F.3d at 566 n.25 (discussing reliability of testimony by economic and statistical experts).

## b. Relevance

The Federal Rules of Evidence also require that expert testimony, like all admissible testimony, relate to a pertinent issue in the case.  Indeed, Rule 702(a) provides that expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  Consequently, the Court may exclude even reliable expert testimony if no logical relationship exists between the testimony and a fact or issue in the case.  Daubert, 509 U.S. at 591; Allison, 184 F.3d at 1312.

46

AO 72A

(Rev.8/8

### c.   Other Considerations

The Eleventh Circuit has cautioned that "'it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence.'" Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011) (quoting Quiet Tech. DC-8, Inc., 326 F.3d at 1351). "'Quite the contrary, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shady but admissible evidence.'" Id. (quoting Quiet Tech. DC-8, Inc., 326 F.3d at 1341 (internal punctuation marks omitted)).   "Indeed, 'in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of

47

AO 72A
(Rev.8/8
2)

the evidence rather than its admissibility.'" <u>Id.</u> (quoting <u>Hemmings v. Tidyman's Inc.</u>, 285 F.3d 1174, 1188 (9th Cir. 2002)).

### 2.   Discussion

For the following reasons, the Court grants in part and denies in part Plaintiff's Motion to Exclude.  First, the Court agrees with Plaintiff that Dr. Bennett simply is not qualified to offer an opinion as to whether Mr. Keith committed suicide.  Although Dr. Bennett has extensive experience, his experiences do not lie squarely in the field of psychology or psychiatry, and his educational background also does not qualify him to offer an opinion concerning whether Mr. Keith committed suicide.  Further, his opinion concerning suicide versus accident is, as Plaintiff argues, primarily a matter of

48

common sense, and would not provide much help to the jury.

With respect to the opinions concerning the toxicology report, Dr. Bennett's education and experience would qualify him to offer opinions concerning drugs and the effect of drugs on the human body. As Plaintiff points out, however, many of the opinions that Dr. Bennett seeks to offer in this area, including his opinions concerning post-mortem redistribution of zolpidem and tramadol in peripheral blood, as opposed to central blood, are pure speculation, and consequently are unreliable. Most of the articles that Dr. Bennett cited in support of this theory involved central blood, not peripheral blood, and Dr. Bennett largely relied on abstracts, or summaries, of articles to

49

determine that tramadol and zolpidem result in post-mortem redistribution and to support his opinion that the tramadol and zolpidem may have been completely absorbed by Mr. Keith's system before his death. Under those circumstances, those opinions do not satisfy <u>Daubert</u>'s reliability standard.

Plaintiff also argues that the Court should strike any opinions that Dr. Bennett did not present in his expert report. The Court, however, denies this request. Even if those opinions were not contained in Dr. Bennett's original report, Plaintiff suffered no prejudice from the failure to include those opinions in the original report. Plaintiff had every opportunity to cross-examine Dr. Bennett extensively on those topics, and its counsel certainly took advantage of

50

that opportunity.  Indeed, Plaintiff's counsel elicited most of the opinions that Plaintiff now seeks to strike.  Under those circumstances, Plaintiff has suffered little, if any, prejudice from any alleged failure to include the opinions in the expert report.   The Court therefore declines to strike the "additional" opinions offered at Dr. Bennett's deposition.

## IV.  Conclusion

ACCORDINGLY, the Court **GRANTS IN PART AND DENIES IN PART** the Motion to Exclude [115].  The Court **DENIES** the portion of the Motion that seeks an Order striking opinions that are not contained in Dr. Bennett's expert report.  The Court **GRANTS** the portion of the Motion that seeks to exclude Dr. Bennett's opinions as to whether Mr. Keith's death was an accident or suicide, as well as the

51

AO 72A

(Rev.8/8

portion of the Motion that seeks to exclude Dr. Bennett's opinions concerning the toxicology report, including his opinions concerning post-mortem redistribution of zolpidem and tramadol.

IT IS SO ORDERED, this the _7_ day of March, 2014.

UNITED STATES DISTRICT JUDGE

52